E-FILED
Wednesday, 25 May, 2022  04:28:49 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| HEATHER KAINZ, SARA BAILEY, REBECCA BUCZKOWSKI, SABRINA DRYSDALE, & REBEKAH MCGRATH, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.  1:21-cv-01250 |
| v. | ) ) ) | |
| ILLINOIS DEPARTMENT OF CORRECTIONS; ROB JEFFREYS, *in his individual and official capacities*; LEONTA JACKSON, *in his individual and official capacities*; TERI KENNEDY, *in her individual capacity*; EMILY RUSKIN, *in her individual capacity*; KELLY RENZI, *in her individual capacity*; JOHN SOKOL, *in his individual capacity*; & WEXFORD HEALTH SOURCES, INC.,* | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>ORDER</u>

This matter is before the Court on several motions directed at the pleadings; each motion has been fully briefed and is ripe for review. For the following reasons, the Motion to Strike (doc. 63) by Defendants Wexford Health Sources, Inc. (Wexford) and John Sokol is denied; Defendant Wexford's Motion to Dismiss (doc. 65) is denied; the Motion to Dismiss (doc. 69) by Defendants Illinois Department of Corrections (IDOC), Rob Jeffreys, Leonta Jackson, and John Burle[1] is granted in part and denied

---

[1] Though counsel cites the wrong rule (doc. 71 at 11 n.1), counsel is correct that current Warden John Burle is automatically substituted for former Warden Leonta

in part; Plaintiffs' Motion to Strike Defendants Wexford's and Sokol's affirmative defenses (doc. 79) is granted; and Plaintiffs' Motion to Strike Defendant IDOC's affirmative defenses (doc. 80) is granted in part and denied in part.

## BACKGROUND[2]

Plaintiffs[3] are female medical and mental health providers at Pontiac Correctional Center and have initiated this putative class-action lawsuit after several years of pervasive, offensive sexual conduct by inmates at Pontiac. Plaintiffs have each reported experiencing some or all of the following: (1) exposure of genitals by inmates; (2) masturbation attacks, whereby an inmate masturbates on or at the employee while staring at her, calling out to her, or otherwise trying to engage her attention; (3) verbal and written sexual taunts and advances; and (4) being doused with inmates' urine. (Doc. 60 at 15–22). Such attacks are not limited to one specific area; they occur in the infirmary, therapy and treatment rooms, gallery, cell blocks, and recreation yards. (Doc. 60 at 15–22). The attacks have been so numerous over the past few years that Plaintiffs have found it impossible to document each incident. (Doc. 60 at 2, 15–22). And when they do document and report the incidents, their

---

Jackson with respect to the claims asserted against Defendant Jackson in his official capacity. *See* Fed. R. Civ. P. 25(d).

[2] These facts are derived from the Amended Complaint and are taken as true, as is required at the pleading stage. This section is meant to provide a general background; additional facts will appear *infra* as necessary.

[3] There are two categories of Plaintiffs: those employed by Defendant IDOC and those employed jointly by Defendants Wexford and IDOC. (Doc. 60 at 6–7). The relevant timeframe for employment is June 16, 2019, through June 16, 2021; Plaintiffs Kainz and Bailey are no longer employed at Pontiac but were stationed there during part of the relevant timeframe. (Doc. 60 at 6).

supervisors direct them to cease doing so and tell them to expect and accept such behavior from the inmates. (Doc. 60 at 24). Plaintiffs are further told to "set their own boundaries and limits with inmates on an individual and *ad hoc* basis" and, when subjected to an attack at an inmate's cell, are required to stand at the cell entry and endure the attack for at least fifteen minutes before walking away. (Doc. 60 at 24–25).

Plaintiffs have filed a four-count Amended Complaint against IDOC, Wexford, and several of their supervisory employees alleging violations of the equal protection clause (Counts I, II); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (Count III); and (3) the Illinois Civil Rights Act (ICRA), 740 ILCS 23/5 (Count IV). (Doc. 60). The gravamen of this lawsuit is that Defendants' current policies and procedures not only fail to mitigate the inmates' problematic behavior but exacerbate it, and yet Defendants have done nothing to address this issue despite their personal knowledge thereof. (*See* doc. 60 at 3–5).

## DISCUSSION

As indicated, this Order resolves several Motions directed at the pleadings. The Court will address each Motion in turn.

## I.  Motion to Strike by Defendants Wexford and Sokol

Defendants Wexford and Sokol first move to strike Plaintiffs' class allegations from the Amended Complaint. (Docs. 63, 64). There are no hard and fast rules governing when issues pertinent to class certification must be resolved. *See* Fed. R. Civ. P. 23(c)(1)(A) ("At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action

as a class action."). "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982). That said, the trend has been to take up the class certification question after dispositive motions have been resolved.[4] 3 William B. Rubenstein, *Newberg on Class Actions* § 7:8 (5th ed.).

When presented with a motion to strike class allegations at the pleading stage, courts in this circuit generally look to Rule 23 rather than Rule 12(f). *See Hohmann v. Packard Instrument Co.*, 399 F.2d 711, 713 (7th Cir. 1968); *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014) ("Courts in this District . . . evaluate motions to strike class allegations under Rule 23, not Rule 12(f).").[5] As "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Falcon*, 457 U.S. at 160 (internal quotation marks omitted), discovery is often necessary prior to deciding whether the requirements of Rule 23 have been met. Consequently, in considering a motion to strike class allegations at this early stage of the proceedings,

---

[4] This practice promotes efficiency as well as several other policy goals, as outlined in 3 Newberg on Class Actions § 7:8.

[5] *But see Stauffer v. Innovative Heights Fairview Heights, LLC*, No. 3:20-CV-00046, 2021 WL 2256031, at *2 (S.D. Ill. June 3, 2021) ("Generally speaking, a motion to strike is properly brought under Rule 12(f). . . . [T]his Court [has] characterized a motion to strike under Rule 23(d)(1)(D) as 'jumping the gun' because the requirements of Rule 23 must be decided in the context of a motion for class certification.") (internal citations omitted)).

the court must determine whether discovery could aid the class proponent's arguments for class certification.

According to Defendants Wexford and Sokol, Plaintiffs' putative class action is wholly foreclosed by the Seventh Circuit's decision in *Howard v. Cook Cty. Sheriff's Off.*, 989 F.3d 587 (7th Cir. 2021). The Court disagrees. In *Howard*, the Seventh Circuit indeed found the plaintiffs, who raised claims similar to Plaintiffs' here, had failed to make the requisite showing of commonality and typicality and thus concluded the plaintiffs could not sustain a class-action lawsuit. *Id.* at 598–607. However, a careful reading of that opinion shows the Seventh Circuit's decision was based on factual, not legal, determinations. *See generally id.* at 604 ("Hostile work environment claims are fact[-]intensive."). The Seventh Circuit did not hold as a matter of law that claims of direct harassment, or even ambient harassment, could never predicate a class-action lawsuit. It thus remains possible that, with the right facts, Plaintiffs here can succeed where the plaintiffs in *Howard* failed.

For this reason and others,[6] Defendants' Motion to Strike Plaintiffs' class allegations is premature. This is simply not one of the rare cases in which the

---

[6] Of particular note, Defendants cannot say with certainty which legal theory Plaintiffs are pursuing: direct harassment, ambient harassment, a combination of both, or another theory entirely. As plaintiffs need not plead a specific legal theory to comport with Federal Rule of Civil Procedure 8(a), it is inappropriate to assume which legal theory Plaintiffs will pursue for the purpose of dismissing a portion of the Amended Complaint. Moreover, Federal Rule of Civil Procedure 15 instructs that leave to amend be granted liberally; should the need arise, Plaintiffs may seek leave to amend their pleading to better comport with the legal theory they ultimately advance. And Rule 23 grants the Court wide discretion to shape and define any class that does achieve certification.

Amended Complaint is so facially and inherently deficient as to render class certification impossible. Rather, this is a case in which the Court must "probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160. Plaintiffs must therefore be allowed the opportunity to engage in discovery and mount their case for class certification at an appropriate stage of these proceedings.

## II.   Motions to Dismiss

Before the Court are two separate Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 65, 69).

### A.   *Legal Standard*

To survive dismissal pursuant to Rule 12(b)(6), the complaint must contain a "short and plain statement of the [plaintiff's] claim" sufficient to plausibly demonstrate entitlement to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is not required to anticipate defenses or plead extensive facts or legal theories; rather, the complaint need only contain enough facts "to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010); *see also Twombly*, 550 U.S. at 570. In sum, "[t]he questions under Federal Rule of Civil Procedure 8(a)(2) are whether the defendant has fair notice of what he must defend himself against and whether there is some reason to believe he could be found

6

liable at the end of the case." *Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020), *reh'g denied* (Aug. 21, 2020).

On review of a Rule 12(b)(6) motion, the complaint is construed in the light most favorable to the plaintiff. *See United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) (citing *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016)). This means "accept[ing] all of the well-pleaded facts as true and 'draw[ing] all reasonable inferences [from those facts] in favor of the plaintiff.' " *Id.* (quoting *Kubiak*, 810 F.3d at 480–81). The court "may reject sheer speculation, bald assertions, and unsupported conclusory statements." *Taha v. Int'l Bhd. of Teamsters, Loc.* 781, 947 F.3d 464, 469 (7th Cir. 2020). " 'Naked assertions devoid of factual enhancement' [are] insufficient." *Dabbs v. Peoria Cnty. Ill.*, No. 1:16-cv-01463, 2017 WL 3574999, at *2 (C.D. Ill. Jan. 12, 2017), *aff'd*, 690 F. App'x 416 (7th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).

B.   *Motion to Dismiss by Defendant Wexford*

Defendant Wexford seeks dismissal pursuant to Rules 12(b)(1) and (6), claiming, respectively, the IDOC Plaintiffs do not have standing to maintain a Title VII suit against Defendant Wexford and the Wexford Plaintiffs are either inadequate class representatives or have not exhausted their claims. (Docs. 65, 66). Plaintiffs have clarified in both the Amended Complaint and their Response to Defendant's Motion that the IDOC Plaintiffs are not asserting their Title VII claims against Defendant Wexford. (Docs. 60 at 38; 78 at 1). Defendant Wexford's Motion to Dismiss for want of standing must therefore be denied.

Defendant Wexford's next argument is also misguided. It argues Plaintiffs Kainz and Bailey are inadequate class representatives because they are no longer employed at Pontiac, rendering their claims atypical of the putative class. (Docs. 66 at 6; 64 at 13–16). In support of this position, Defendant Wexford relies solely on *Lavin v. Chicago Board of Education*, 73 F.R.D. 438 (N.D. Ill. 1977). In *Lavin*, a former high school student athlete brought suit for alleged violations of the equal protection clause and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, on behalf of herself and a putative class of "all female high school students who have been, are now, and will be denied a full opportunity to participate in varsity, interscholastic, and intramural sports on the basis of sex." *Lavin*, 73 F.R.D. at 439–40. The Northern District of Illinois ultimately concluded the plaintiff was not an adequate class representative because she had graduated from high school and was therefore no longer a member of one of the subclasses she sought to represent, as she had neither a "continuing injury [nor] real interest in injunctive relief." *Id.* at 441.

Defendant Wexford likens Plaintiffs Kainz and Bailey to the plaintiff in *Lavin* because they no longer work in the setting of which they complain. According to Defendant Wexford, this means Plaintiffs Kainz and Bailey are no longer "members of the class they seek to represent for purposes of injunctive relief." (Doc. 64 at 16). However, *Lavin* was decided in the context of class certification, and as previously discussed, this case is not yet at that stage; Defendant Wexford's argument is thus premature. Moreover, *Lavin* expressly disavowed the very analogy Defendant Wexford asks the Court to draw: "[The plaintiff's] status may be distinguished from

challengers to *employment practices*, welfare benefits, housing regulations, or voting provisions all of whom stand to benefit from injunctive relief by reinstatement or requisition of interest." 73 F.R.D. at 441 (emphasis added). Unlike the former student in *Lavin*, Plaintiffs Kainz and Bailey could be reinstated to their former positions, giving them a real interest in the injunctive relief sought herein. As *Lavin* is expressly inapposite and as Defendant Wexford's entire argument for dismissal is based on that case and the assumption that Plaintiffs Kainz and Bailey are inadequate class representatives,[7] the Court may deny Defendant Wexford's Motion to Dismiss without discussing its remaining arguments.

## C.   *Motion to Dismiss by Defendants IDOC, Jeffreys, Jackson, and Burle*

Defendants IDOC, Jeffreys, Jackson, and Burle seek dismissal for a number of reasons. The Court will address each argument in turn.

### 1.  **ICRA Claim – Count IV**

Defendant IDOC challenges Plaintiffs' ICRA claim in Count IV of the Amended Complaint. First, it alleges Plaintiffs lack standing to raise the claim.[8] (Doc. 71 at 3–5). It then challenges Plaintiffs' ability to raise their claim under the ICRA, arguing it is preempted by the Illinois Human Rights Act (IHRA), 775 ILCS 5/1–101 *et seq.*,

---

[7] This holding does not signify that Plaintiffs have met their burden under Rule 23(a)(4) to demonstrate the adequacy of the putative class representatives. The Court is merely holding Defendant Wexford has not demonstrated Plaintiffs Kainz and Bailey are *inadequate* class representatives at this juncture.

[8] Ordinarily, the Court would address the issue of standing first. However, because the question of whether the claim may be brought under the ICRA bears directly on the redressability prong of the standing inquiry, the Court will address the latter issue first. As will be discussed, Plaintiffs' claim cannot be asserted under the ICRA, negating the remainder of the standing inquiry.

and "the ICRA does not provide a judicial remedy for employment discrimination." (Docs. 71 at 5–7; 69 at 2).

The IHRA provision purporting preemption states: "Except as otherwise provided by law, no court . . . shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(D). As a general matter, the IHRA preempts *common law tort claims* that are "inextricably linked" to the civil rights violations set forth in the IHRA. *Richards v. U.S. Steel*, 869 F.3d 557, 564 (7th Cir. 2017); *see also Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 517, 687 N.E.2d 21, 23 (1997). Defendant IDOC cites no authority holding this jurisdictional bar applies to claims created by statute, and, although somewhat inartfully written, the plain language of the provision appears to mean claims created by statute are excluded from the jurisdictional bar. 775 ILCS 5/8-111(D); *see also Smith v. Bd. of Educ. for Waukegan Pub. Sch. Dist. # 60*, No. 20-CV-03069, 2021 WL 4459529, at *7 (N.D. Ill. Sept. 29, 2021).

Assuming, *arguendo*, the IHRA jurisdictional bar does apply to statutorily created claims, it would not preempt Plaintiffs' ICRA claim here. Plaintiffs' ICRA claim accuses Defendant IDOC of "intentionally fail[ing] to take measures reasonably calculated to end or mitigate" the inmates' offensive conduct. (Doc. 60 at 40). The IHRA clearly creates rights and duties that would allow employees like Plaintiffs to assert such a claim. 775 ILCS 5/2-102(D) ("[A]n employer shall be responsible for sexual harassment of the employer's employees by nonemployees or nonmanagerial and nonsupervisory employees . . . if the employer becomes aware of the conduct and

10

fails to take reasonable corrective measures."); *see also* 775 ILCS 5/2-101(E) (defining

"sexual harassment").

Turning to the issue of preemption, Section 111(D) of the IHRA "tells us that

the 'subject' of an alleged 'civil rights violation' must be heard under the procedures

of the Act." *Richards*, 869 F.3d at 563.

> To draw the line between preemption versus not, the Illinois Supreme
> Court has boiled down the inquiry as follows: whether a court "may
> exercise jurisdiction over a tort claim depends on whether the tort claim
> is inextricably linked to a civil rights violation such that there is no
> *independent* basis for the action apart from the Act itself." Put another
> way, the key to preemption is not whether the facts that support a
> common law tort claim (like intentional infliction of emotional distress)
> would also support a claim under the Human Rights Act, but rather
> whether the plaintiff can prove the elements of the tort "*independent* of
> any legal duties created by the Illinois Human Rights Act."

*Id.* at 564 (quoting *Maksimovic*, 177 Ill. 2d at 517 (emphasis in original)). Accordingly,

"the concrete question to ask is whether the plaintiff states a valid . . . claim without

needing to rely on the rights and duties created by the Human Rights Act." *Id.* This

inquiry " 'rest[s] on an examination of legal duties, not on the factual' overlap between

the claims." *Id.* (quoting *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 603 n.4 (7th Cir.

2006)).

11

The question here thus becomes whether the ICRA creates identical legal duties such that Plaintiffs can state their claim under the ICRA without relying upon the legal duties created by the IHRA.[9] Section 5(a) of the ICRA provides:

No unit of State, county, or local government in Illinois shall:

> (1) exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender; or

> (2) utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender.

740 ILCS 23/5(a). Plaintiffs purport to bring their claim under both subsections. (Doc. 76 at 2, 6).

There is very little case law specifically considering whether the ICRA encompasses discrimination in the context of government employment, and the little case law existing is wildly inconsistent. *See Tapia v. City of Chicago*, No. 19-C-1257, 2019 WL 3716915, at *7 (N.D. Ill. Aug. 7, 2019) (declining to decide at the dismissal stage whether the ICRA encompassed employment discrimination); *Rao v. Gondi*, No. 14-C-66, 2014 WL 5423441, at *5 (N.D. Ill. Oct. 23, 2014) (concluding, without citation to any authority, "tenured employment with the University constituted a program or activity under which the ICRA prohibits discrimination based on national origin");

---

[9] Notably, the manner in which the IHRA's preemption clause has been interpreted answers in a round-about way the question whether that jurisdictional bar applies to statutorily created claims. If a statute creates a legal duty forming the basis of a claim such that the claimant need not rely on the legal duties created by the IHRA, then the claim is not preempted, even if the IHRA provides a claim covering the same factual scenario.

*Fields v. Ill. Dep't of Corr.*, No. 03-CV-4222, 2005 WL 8173889, at *2 (S.D. Ill. Dec. 2, 2005) (concluding "the IHRA, not the ICRA, governs employment discrimination cases"); *LaRiviere v. Bd. of Trustees of S. Ill. Univ.*, 2015 IL App (5th) 140443-U, ¶ 21 (opining, in dicta, "a claim of individual employment discrimination . . . appears to be one that is properly brought under [the IHRA]," not the ICRA). Multiple courts, including this Court, have assessed employment discrimination claims under the ICRA without specifically analyzing whether the Act actually encompasses employment discrimination; notably, those cases did not involve the preemption argument raised here. *See, e.g.*, *Warr-Hightower v. Ill. Cent. Coll.*, No. 1:17-CV-01153, 2017 WL 5484671, at *8 (C.D. Ill. Nov. 15, 2017); *Hosick v. Chi. State Univ. Bd. of Trustees*, 924 F. Supp. 2d 956, 966 (N.D. Ill. 2013).

To understand the reach of the ICRA in light of the IHRA, the undersigned must resort to the tools of statutory construction utilized by Illinois courts. *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1061 (7th Cir. 2020). "In Illinois, the 'primary objective in construing a statute is to ascertain and give effect to the intent of the legislature.'" *Id.* (quoting *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 461, 939 N.E.2d 487, 490 (2010)). "The plain language of a statute is the most reliable indication of legislative intent." *JPMorgan*, 238 Ill. 2d at 461.

> [W]hen the language of the statute is clear, it must be applied as written without resort to aids or tools of interpretation. The statute should be read as a whole and construed so that no term is rendered superfluous or meaningless. We do not depart from the plain language of a statute

> by reading into it exceptions, limitations or conditions that conflict with
> the legislative intent.

*Id.* (internal quotation marks and citations omitted). The parties' arguments and the

inconsistent judicial interpretations of the ICRA evince a degree of ambiguity, at least

in practice. Where statutory language is ambiguous, Illinois courts consult "similar

and related enactments, though not strictly *in pari materia*." *DeLuna v. Burciaga*,

223 Ill. 2d 49, 60, 857 N.E.2d 229, 236 (2006).

The ICRA and IHRA were enacted provide rights and remedies parallel to

those in Titles VI and VII of the Civil Rights Act of 1964, respectively; they are

therefore largely interpreted and enforced in lockstep with those provisions. *See

Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 889 (N.D. Ill. 2015) (ICRA); *Jones v.

Nat'l Council of Young Men's Christian Ass'ns of the United States*, 48 F. Supp. 3d

1054, 1089 (N.D. Ill. 2014) (IHRA); *Gilliam v. Berkeley Cont. Packaging, LLC*, No. 12-

CV-1174, 2014 WL 2927023, at *2 (S.D. Ill. June 27, 2014) (IHRA). Consequently,

there is very little case law interpreting the specific language of the ICRA, as courts

have a tendency to immediately turn to federal interpretations of Titles VI and VII

in considering ICRA and IHRA claims.[10]

Generally speaking, employment discrimination claims must be brought under

Title VII rather than Title VI. "Title VI does not provide a judicial remedy for

employment discrimination by institutions receiving federal funds unless (1)

---

[10] ICRA claims asserting employment discrimination have generally been assessed against the backdrop of Title VII jurisprudence as opposed to Title VI without much, if any, analysis as to why. *See, e.g.*, *Warr-Hightower*, 2017 WL 5484671, at *8 (C.D. Ill. Nov. 15, 2017).

providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Ahern v. Bd. of Educ. of Chi.*, 133 F.3d 975, 978 (7th Cir. 1998) (citation omitted); *see also* 42 U.S.C. § 2000d-3[11] ("Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer . . . except where a primary objective of the Federal financial assistance is to provide employment.").

Given that courts have departed from this canon with respect to the Illinois counterparts to Titles VI and VII by considering garden-variety employment discrimination claims brought under the ICRA, it is worth comparing the statutory language of the ICRA to that of Title VI. Title VI states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. This is very similar language to Subsection 5(a)(1) of the ICRA: "No unit of State, county, or local government in Illinois shall . . . exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender." It thus

---

[11] "The sponsor of this section, Senator Cooper, stated that it was designed to clarify that 'it was not intended that [T]itle VI would impinge on [T]itle VII.' " *Johnson v. Transportation Agency, Santa Clara Cty., Cal.*, 480 U.S. 616, 628 (1987) (quoting 110 Cong. Rec. 11615 (1964)).

reasonably follows that, like Title VI, Section 5(a)(1) of the ICRA does not, as a general matter, encompass discrimination in government employment because "employment is not ordinarily conceptualized as a 'service, program, or activity' of a public entity," *Brumfield v. City of Chicago*, 735 F.3d 619, 626 (7th Cir. 2013).

But recall that Subsection 5(a)(2) of the ICRA further states: "No unit of State, county, or local government in Illinois shall . . . utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2). The Seventh Circuit's decision in *Brumfield* is helpful in analyzing the effect of this language. There, the court clarified the scope of Title II of the Americans with Disabilities Act (ADA), which states "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," 42 U.S.C. § 12132. *Brumfield*, 735 F.3d at 626. Like the second clause of Title II of the ADA—"or be subjected to discrimination" by a state or local unit of government—the language in Subsection 5(a)(2) of the ICRA is extremely broad. Indeed, the *Brumfield* court opined the similar clause in Title II of the ADA—when read in isolation—expressly covers "*all* forms of discrimination by state and local governments in the provision of public services, programs, or activities," which could arguably encompass employment discrimination. *Id.* at 627 (emphasis in original). However, the court ultimately concluded Title II

16

unambiguously does not encompass employment discrimination by government employers. *Id.* at 627–30.

To reach this conclusion, the Seventh Circuit first looked to the statutory definition of "qualified individual with a disability": "an individual with a disability who . . . *meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity*." *Id.* at 627 (quoting 42 U.S.C. § 12131(2) (emphasis in original)). This definition limits "the class of people who may invoke § 12132's protection . . . to those eligible to receive or participate in the public entity's outputs." *Id.* The ICRA, by contrast, contains no similar limitation. It is broader still in that it prohibits the use of "criteria or methods of administration *that have the effect* of subjecting individuals to discrimination[.]" 740 ILCS 23/5(a)(2). This language therefore purports to cover *all* forms of discrimination[12]—both direct and indirect[13]—by state and local governments. As the ICRA lacks any limitation like that in Title II of the ADA, the plain language of the Act reasonably and logically extends to discrimination in government employment.

The court also considered Title II in conjunction with the ADA as a whole. The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public

---

[12] That is, all forms of discrimination on the basis of race, color, national origin, or gender. 740 ILCS 23/5(a)(2).

[13] Though this language is expressly aimed at indirect discrimination, it inherently prohibits direct discrimination as well; criteria or methods of administration that directly discriminate against individuals certainly have the effect of doing so.

accommodations, which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004). As "[t]he statute should be read to perform a nonredundant role in the broader statutory scheme[,] . . . Title II is clearly inapplicable to employment discrimination because Title I specifically, comprehensively, and exclusively addresses disability discrimination in employment." *Brumfield*, 735 F.3d at 628. Defendants employ this line of reasoning. Indeed, Illinois courts presume "the legislature intended that two or more statutes which relate to the same subject are to be read harmoniously so that no provisions are rendered inoperative." *Knolls Condo. Ass'n v. Harms*, 202 Ill. 2d 450, 458–59, 781 N.E.2d 261, 267 (2002).

The IHRA is unquestionably a comprehensive statutory scheme that prohibits civil rights violations such as employment discrimination, *see* 775 ILCS 5/2-102, and it purports a measure of exclusivity, 775 ILCS 5/8-111(D). But it does not preclude other civil rights claims that are created by statute, such as the ICRA, the plain language of which also prohibits employment discrimination by state government. Adopting Respondent's view that the ICRA simply does not cover employment discrimination would impermissibly read into Subsection 5(a)(2) of the ICRA restrictive language that is conspicuously absent. As the Court cannot read the statutes harmoniously without judicially inserting absent restrictive language in one or the other, the Court must turn to additional canons of construction utilized by Illinois courts to determine the interplay of these overlapping statutes.

"Where a general statutory provision and a more specific statutory provision relate to the same subject, [Illinois courts] will presume that the legislature intended

the more specific provision to govern." *Moore v. Green*, 219 Ill. 2d 470, 480, 848 N.E.2d

1015, 1021 (2006); *see also In re Jarquan B.*, 2017 IL 121483, ¶ 34, 102 N.E.3d 182.

Illinois courts also "presume that the legislature intended the more recent statutory

provision to control." *Moore*, 219 Ill. 2d at 480. Applying these principles, the IHRA

governs employment discrimination claims like Plaintiffs' because it is the more

specific statutory scheme. Plaintiffs' argument the ICRA is the more specific statute

is unavailing. The ICRA is extremely broad and, as stated, encompasses all forms of

discrimination by state and local governments. This broad, general sweep is the

opposite of specific, particularly when compared to the IHRA's comprehensive and

specific prohibitions, procedures, and definitions. Moreover, the IHRA requires

administrative exhaustion before justice may be sought in a court of law. 775 ILCS

5/7A-102, 8-111(D). Though the ICRA is the more recent of the two Acts, the

undersigned suspects the Illinois General Assembly did not intend to create an end-

run around the administrative procedures mandated by the IHRA, particularly in

light of the sponsors' commentary on the bill during legislative debate.[14]

---

[14] As explained in *Illinois Native American Bar Association v. University of Illinois by Its Board of Trustees*, 368 Ill. App. 3d 321, 327, 856 N.E.2d 460, 467 (2006):

> Fritchey: The Bill provides a venue for individuals to bring a cause of action alleging disparate impact of a government policy via the State Courts which they presently do not have. . . . Again, it's just by way of history, there was a Supreme Court case which limited the ability of individuals to bring actions pursuant to Title VI under the Federal Act and we are simply trying to reinstate the ability of individuals to sue under the State Act. *It's not intended to expand or limit whatever rights somebody would've had.*" (Emphasis added.) 93d Ill. Gen. Assem., House

In sum, the Court finds both the IHRA and the ICRA purport to govern discrimination in the government employment context, but application of Illinois' general/specific rule mandates such claims be brought under the IHRA rather than the ICRA. Accordingly, Count IV must be dismissed with prejudice insofar as it purports to arise under the ICRA but without prejudice insofar as Plaintiffs may, as permitted by law, pursue their claim under the IHRA.

## 2. Section 1983 Claims – Counts I and II

Plaintiffs assert two claims under § 1983: one alleging an equal protection violation and seeking damages against Defendants Jeffreys and Jackson in their individual capacities (Count I) and another alleging an equal protection violation and seeking injunctive relief from Defendants Jeffreys and Burle in their official capacities (Count II). Defendants Jeffreys, Jackson, and Burle raise several arguments against these claims.

### a. *Personal Involvement – Counts I and II*

Defendants Jeffreys, Jackson, and Burle, the Director of IDOC and former and current wardens at Pontiac, respectively, challenge the sufficiency of the § 1983 claims against them, arguing Plaintiffs' Amended Complaint does not sufficiently

---

Proceedings, April 3, 2003, at 146–48 (statements of Representative Fritchey).

"Senator Harmon: [The bill] does not break any new legal ground nor create any new rights. Rather, it creates a State right of action that has existed at the federal level for over thirty years. . . . *There is no new exposure for the State, simply a new venue—State court rather than federal court.*" (Emphasis added.) 93d Ill. Gen. Assem., Senate Proceedings, May 21, 2003, at 9–10 (statements of Senator Harmon).

allege personal involvement by Defendants Jeffreys and Jackson in their respective supervisory roles. (Doc. 71 at 9–11).

Section 1983 is a vehicle through which individuals may seek redress for constitutional violations by persons acting under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). However, a government official may be held liable only for her own misconduct; "[t]here is no such thing as *respondeat superior* liability for government officials under § 1983." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021).

> The supervisor is therefore liable only if she was personally involved in the constitutional violation. Personal involvement in a subordinate's constitutional violation requires supervisors to know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. Put another way, personal involvement in the equal protection context requires specific intent to discriminate.

*Id.* at 493–94 (internal quotation marks and citations omitted).

In support of this argument, Defendants rely heavily on the Seventh Circuit's decision in *Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998). There, the plaintiff argued a prison warden was liable for "knowingly ignoring prison policies requiring that two towers and a catwalk be manned with guards." *Id.* at 741 (internal quotation marks omitted). The plaintiff theorized the warden systemically condoned the failure to enforce certain safety policies in violation of the Eighth Amendment. *Id.* The court rejected this theory, finding the complaint did not assert "a systematic lapse in prison security that was known to the warden;" rather, "[t]he gravamen of the complaint [was] that the plaintiff was left vulnerable to attack because there were no guards in the towers on a particular day at a particular time." *Id.* Because wardens are "not

liable for . . . isolated failure[s] of . . . subordinates to carry out prison policies" and "cannot be assumed to be directly involved in the prison's day-to-day operations," the court concluded the plaintiff had failed to adequately allege personal involvement by the defendant warden in the alleged constitutional deprivation. *Id.* Notably, the *Steidl* court left open the door for the inference that a warden would be aware of a pervasive, systemic issue within the institution she oversees. *See id.* (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1428–29 (7th Cir. 1996)).

This case falls within that latter category. Unlike in *Steidl*, Plaintiffs do not allege an isolated incident; they allege a systemic, ongoing failure to address pervasive sexual harassment by inmates. They allege Pontiac administrators at the highest level were aware of the pervasive sexual harassment and not only did nothing to curtail it but required Plaintiffs to endure the harassment and told Plaintiffs and their coworkers to deal with the problem themselves by "set[ting] their own boundaries" with the inmates. (Doc. 60 at 24–25). Specifically, the Amended Complaint alleges:

> IDOC and Wexford administration and supervisors, including Dr. Kelly Renzi and Dr. John Sokol, have told Plaintiffs and the putative Class to expect and accept indecent penis exposure and masturbation attacks by inmates. . . .
>
> IDOC wardens and administrators, including Defendant Emily Ruskin, have . . . stat[ed] that there is nothing they can do about the indecent penis exposure and masturbation attacks by inmates . . . and [told] Plaintiffs and the putative Class to quit writing tickets while simultaneously requiring them to stand at the cell front and not walk away even if an inmate was masturbating. . . .
>
> [A]t a meeting in February 2019, Ms. Bailey reported to Defendants Renzi and Sokol that she was uncomfortable standing in front of a cell trying to carry out her assessment while that inmate or other inmates

were masturbating at her. She told Defendants that she did not want to spend 15 minutes standing there being masturbated at by one or more male inmates. In response, Dr. Renzi told Ms. Bailey in the presence of putative Class members, that they had to stay at the cell-front for at least 15 minutes, thereby specifically requiring female employees to endure indecent exposure and masturbation attacks during the performance of their duties.

(Doc. 60 at 24–25). These allegations not only evince a failure to prevent or mitigate known pervasive sexual harassment, but they demonstrate how official policies at Pontiac exacerbate the problem not only by requiring Plaintiffs and the putative class to endure sexual harassment but also by creating an environment in which the inmates can harass Plaintiffs and the putative class without consequence.

Unlike in *Steidl*, it can be presumed at this stage of the proceedings that the warden of an institution would be aware of a pervasive, ongoing systemic issue in her institution like the one alleged in the Amended Complaint and, at least partly if not wholly, responsible for the institutional policies that not only fail to address the issue but exacerbate it. *See Antonelli*, 81 F.3d at 1428–29; *Graham v. McLaurin*, No. 3:15-CV-1114, 2017 WL 4122752, at *2 (S.D. Ill. Sept. 18, 2017). But the same cannot be said for the Director of IDOC, Defendant Jeffreys. Nothing in the Amended Complaint permits any inference, reasonable or not, that Defendant Jeffreys knew of the alleged issues at Pontiac. Plaintiffs do not allege their counterparts at other IDOC institutions are subjected to the same failure to address sexual harassment by inmates, so there is no indication this is a state-wide issue of which the Director of IDOC would be reasonably aware. And although Defendant Jeffreys is generally alleged to have final policy-making authority in IDOC, the Amended Complaint does not indicate the policies at issue are centralized IDOC policies as opposed to Pontiac-

23

specific policies. Absent knowledge of the issue, a direct hand in effectuating the policies exacerbating it and/or failing to mitigate it, or some other fact(s) demonstrating Defendant Jeffreys' personal involvement, liability under § 1983 cannot attach.

The § 1983 claims in Counts I and II against Defendant Jeffreys must therefore be dismissed. Because the deficiency is factual as opposed to legal, Plaintiffs may file an amended complaint if they are able to allege facts demonstrating Defendant Jeffreys' personal involvement in the matters alleged herein.

### b. *Injunctive Relief – Count II*

Defendant Burle next seeks dismissal of the injunctive relief sought against him in Count II. Defendant Burle argues Plaintiffs Kainz and Bailey cannot seek the prospective injunctive relief identified in the Amended Complaint because they no longer work at Pontiac. (Doc. 71 at 11–12). In support of this argument, Defendant Burle cites, *Hogle v. Baldwin*, No. 1:17-CV-01059, 2017 WL 4125258, at *3–4 (C.D. Ill. Sept. 18, 2017), and *Love v. Illinois Department of Corrections*, No. 18-CV-06084, 2020 WL 1237200, at *4 (N.D. Ill. Mar. 13, 2020), neither of which is analogous. In *Hogle*, the plaintiff had died, 2017 WL 4125258, at *4, and in *Love*, the plaintiff had already received the relief sought, 2020 WL 1237200, at *4; thus, prospective injunctive relief had become a moot point in both cases. Though Plaintiffs Kainz and Bailey do not currently work at Pontiac, they could be reinstated to their former

24

positions, giving them an interest in prospective injunctive relief unlike in *Hogle* in *Love. See Lavin*, 73 F.R.D. at 441.

As the party seeking dismissal, it is Defendant Burle's burden to prove entitlement to the relief he seeks. He has not done so here. The Court thus declines to further consider this argument at this stage of the proceedings.

### c.  *Monetary Damages – Count I*

Defendant Jackson next challenges Plaintiffs' request for monetary damages in Count I, arguing the request is a disguised claim against the State in violation of the Eleventh Amendment. (Doc. 71 at 12–13).

"[T]he Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law." *Hafer v. Melo*, 502 U.S. 21, 30 (1991) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 237 (1974)). Accordingly, it "does not erect a barrier against suits to impose individual and personal liability on state officials under § 1983." *Id.* at 30–31 (internal quotation marks omitted). That said, Defendant Jackson is correct in that claimants cannot avoid the Eleventh Amendment's bar against suits for monetary damages against a state by disguising a claim for damages to be paid from a state's treasury as a claim seeking monetary damages against a state official in her individual capacity. *See Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003). In *Omosegbon*, the Seventh Circuit held:

> Dele's claims against the individuals allegedly in their individual capacity present a slightly more complex question, but because he seeks backpay and other forms of monetary compensation based on an employment contract, we think it so inescapable that any resulting

25

judgment will be paid by the state rather than the individual defendants that this bears no resemblance to a bona fide individual capacity suit. (The individuals, after all, were not even parties to the contract in their individual capacity.) Accordingly, he has no § 1983 claim against these defendants[.]

*Id.*

In Count I, Plaintiffs pray for the following relief:

A. enter an Order certifying this suit as a class action on behalf of the proposed Class;

B. designate Plaintiffs as representatives of the Class;

C. designate Plaintiffs' counsel of record as Class Counsel;

*D. enter a judgment against Defendants awarding backpay and lost wages and benefits that Plaintiffs and the Class have suffered as a result of the unlawful employment practices, including pre-judgment interest as permitted by law;*

*E. award Plaintiffs and the members of the class actual, statutory, and punitive damages to which they are entitled;*

F. award Plaintiffs and the members of the Class their costs of suit, including reasonable attorneys' fees, as provided by law;

G. award Plaintiffs and the members of the Class pre- and post-judgment interest as provided by law, from and after the date of service of this Complaint; and

H. award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper.

(Doc. 60 at 32 (emphasis added)). As explained in *Hafer*, Plaintiffs are free to seek monetary damages, such as those identified in Section E, from Defendant Jackson in his individual capacity for his personal involvement in the alleged deprivation of constitutional rights, provided Plaintiffs meet their burden of proof, of course. However, under *Omosegbon*, Defendant Jackson cannot, in his individual capacity, be ordered to pay backpay, lost wages, or benefits attendant to Plaintiffs' and the

26

putative class members' current or former employment with IDOC, as the request for these damages is in reality a request for public funds from the state treasury.

While Plaintiffs seek one form of impermissible damages, they also seek permissible damages. The error therefore does not wholly transform the claim into one barred by the Eleventh Amendment. Accordingly, the Eleventh Amendment demands only the requested relief in Section D of Plaintiffs' prayer for relief as to Count I be dismissed.

Defendant Jackson also fleetingly challenges Plaintiffs' ability to request punitive damages. (Doc. 71 at 13–14). "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Defendant Jackson's argument comprises one sentence: "Plaintiffs fail to allege that Defendant[ ] . . . Jackson personally engaged in any conduct that could support a punitive damages claim against them."[15] (Doc. 71 at 13). The Court has found otherwise; the Amended Complaint allows the reasonable inference Defendant Jackson was aware of pervasive and unwelcome sexual misconduct by inmates directed at female medical and mental health staff at Pontiac and did nothing about

---

[15] It bears noting that Defendant Jackson cites *Howard* for its comment that the Seventh Circuit has never held "ambient harassment can serve as a standalone basis for a hostile work environment claim in the jail or prison context." (Doc. 71 at 14 (quoting 989 F.3d at 602). As previously stated, Plaintiffs have not stated they are pursuing an ambient harassment theory, nor are they required to at this stage of the proceedings. The Court will therefore not make any such assumption.

it and/or created and/or approved a policy that requires female staff to endure such for fifteen minutes per occurrence. *See* Section II(C)(2)(a) *supra*. This is sufficient to request punitive damages against Defendant Jackson in his individual capacity at the pleading stage, particularly where developed argument to the contrary is conspicuously absent.

### 3. Statute of Limitations

Finally, Defendants Burle and Jackson argue the § 1983 claims against them "based upon alleged conduct that occurred prior to June 16, 2019[,] are time-barred." (Doc. 71 at 8). A complaint need not anticipate or overcome affirmative defenses— such as a defense based on a statute of limitations—so dismissal at the pleading stage for untimeliness is unusual. *Cancer Found., Inc. v. Cerberus Cap. Mgmt.*, LP, 559 F.3d 671, 674 (7th Cir. 2009). However, a plaintiff may plead herself out of court "by alleging facts sufficient to establish the complaint's tardiness." *Id.* at 674–75.

The parties agree the applicable statute of limitations is two years, *see* 735 ILCS 5/13-202, rendering the relevant timeframe June 16, 2019, through June 16, 2021. Each named Plaintiff alleges she experienced the misconduct at issue during this window. (Doc. 60 at 16–22). While they also allege the misconduct at issue had been occurring prior to June 16, 2019, this is of no moment because (1) Plaintiffs allege a continuing violation, *see Logan v. City of Chicago*, 4 F.4th 529, 540 (7th Cir. 2021), and (2), regardless, nothing at this stage of the proceedings prohibits Plaintiffs from supporting their claims with facts that occurred outside the limitations period so long as the misconduct continued into the limitations period. In short, this is clearly not one of the unusual cases in which the Amended Complaint patently and

unequivocally demonstrates its tardiness. Dismissal on this ground is thus wholly improper.

## III.   Motions to Strike Affirmative Defenses by Plaintiffs

Plaintiffs move to strike several of the affirmative defenses asserted by Defendants Wexford, Sokol, and IDOC.

### A.   *Defendants Wexford and Sokol*

Defendants Wexford and Sokol have asserted nearly sixty affirmative defenses combined, some of which are duplicative and many others that are, frankly, frivolous. The undersigned will not countenance frivolous filings from represented parties. Counsel for Defendants Wexford and Sokol are admonished of their obligations under Federal Rule of Civil Procedure 11(b); any further frivolous filings will be met with sanctions proceedings.

The parties agree the pleading standard promulgated in *Twombly* and *Iqbal*, outlined in Section II(A) *supra*, applies to the pleading of affirmative defenses.[16] Plaintiffs have challenged forty-one of the nearly sixty asserted defenses. Defendants defend these forty-one defenses in a scant three pages, the vast majority of which is dedicated to several requests to correct a typographical error made throughout the section of Defendants' Answers dedicated to affirmative defenses. (Doc. 84 at 2–4). Defendants dedicate two sentences to defending the following defense by incorporating arguments made by Defendant IDOC: "Further answering and as an

---

[16] Defendants Wexford and Sokol oxymoronically state: "Sufficient facts are not required when asserting an affirmative defense; rather, when raising an affirmative defense, sufficient facts must be plead [sic] to raise the party's right to relief above the speculative level." (Doc. 84 at 2).

affirmative defense, any employment decisions made by [Wexford and/or Sokol] were made for legitimate, non-discriminatory and non-retaliatory business reasons and were undertaken in good faith and in compliance with all applicable laws." (Doc. 84 at 2).[17] The only other sentence that can be interpreted as an argument against dismissal is: "It is the position of Defendants that their Affirmative Defenses do put Plaintiffs on sufficient notice of the defenses asserted against them and that the Affirmative Defenses are proper." (Doc. 84 at 2). This is woefully inadequate.

Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority. *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016). Defendants Wexford's and Sokol's Response (doc. 84) to Plaintiffs' Motion to Strike their affirmative defenses (doc. 79) is the epitome of "perfunctory and undeveloped." Excepting the incorporation of Defendant IDOC's arguments as to one defense asserted by both Defendants Wexford and Sokol, they cite *no* authority supporting their myriad of affirmative defenses beyond the proffered legal standard and develop *no* argument against dismissal despite Plaintiffs' arguments and citations to authority demonstrating several of the defenses are legally frivolous. Accordingly, Defendants Wexford and Sokol have waived their right to argue against dismissal. Plaintiffs' Motion to Strike Defendants Wexford and Sokol's affirmative defenses is therefore granted in its entirety, save for Defendant

---

[17] Given Defendants Wexford and Sokol incorporate Defendant IDOC's arguments, the Court will address the issue *infra* in considering the Motion to Strike Defendant IDOC's affirmative defenses.

Wexford's 16th and Defendant Sokol's 11th affirmative defenses, which will be discussed *infra*.

### B.   Defendant IDOC

Defendant IDOC asserts six affirmative defenses (doc. 72 at 60–61), two of which Plaintiffs move to strike (doc. 80 at 3–5). Unlike Defendants Wexford and Sokol, Defendant IDOC does not appear to agree the pleading standard promulgated in *Twombly* and *Iqbal* applies to the pleading of affirmative defenses.

Pursuant to Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).[18] "An affirmative defense limits or excuses a defendant's liability even if the plaintiff establishes a *prima facie* case." *Bell v. Taylor*, 827 F.3d 699, 704–05 (7th Cir. 2016) (internal quotation marks omitted). "In other words, an affirmative defense is '[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true.' " *Id.* at 705 (quoting *Defense*, Black's Law Dictionary (10th ed. 2014)). Affirmative defenses may be stricken from the pleadings when they are facially insufficient. *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). Additionally, where a proffered affirmative defense merely repeats a denial of the allegations in a complaint, it shall be stricken because the denial puts

---

[18] Like many litigants in a similar position, Defendants IDOC, Wexford, and Sokol place great emphasis on the "the general rule that motions to strike are disfavored," *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). (Docs. 81 at 3; 84 at 2). Nevertheless, motions to strike insufficient affirmative defenses can remove unnecessary clutter and thus "serve to expedite, not delay." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989).

the matter at issue, rendering the "affirmative defense" both improper and redundant. *See Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034, 1041 (N.D. Ill. 2014).

The Seventh Circuit has never explicitly considered whether the *Twombly*/*Iqbal* standard applies to the pleading of affirmative defenses, though several courts in the Northern District of Illinois have so held. *E.g.*, *Edwards v. Mack Trucks, Inc.*, 310 F.R.D. 382, 386 (N.D. Ill. 2015). The Seventh Circuit has, however, held affirmative defenses "are subject to all pleading requirements of the Federal Rules of Civil Procedure" and the pleader must therefore "set forth a 'short and plain statement' of the defense." *Heller*, 883 F.2d at 1294 (quoting Fed. R. Civ. P. 8(a)) (internal citation omitted). This holding lends credence to the faction of courts in this Circuit applying the *Twombly*/*Iqbal* pleading standard to affirmative defenses despite that faction being in the minority nationwide. *See* 5 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1274 (4th ed.). Nevertheless, as Judge Myerscough has observed, "whether the *Twombly*/*Iqbal* pleading standard applies likely makes little difference. Factual allegations that were sufficient before *Twombly* and *Iqbal* will likely still be sufficient, and 'bare bones' affirmative defenses have always been insufficient." *Scholz v. Americare at Adams Pointe Assisted Living, LLC*, No. 20-CV-3034, 2021 WL 661841, at *2 (C.D. Ill. Feb. 19, 2021).

The first of the two challenged defenses is: "Defendant acted at all times with good faith efforts to comply with all laws prohibiting discrimination and in compliance with *Rasho v. Jeffreys*, 07 C 1298." (Doc. 72 at 60). Plaintiffs argue this

defense is insufficiently pled and also fails as a matter of law because it amounts to no more than a denial of the allegations in the Amended Complaint. (Doc. 80 at 3–4).

This affirmative defense contains two separate assertions: (1) Defendant IDOC (and Defendants Wexford and Sokol, by reference) acted in good faith to comply with anti-discrimination laws and (2) Defendant IDOC acted in good faith to comply with its obligations stemming from *Rasho*.[19] While the duties under Title VII are not subject to a good-faith defense whereby an employer may avoid liability by claiming it was acting in "good faith," *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 914 (7th Cir. 2010) ("Title VII does not . . . contain a good-faith 'defense' that allows an employer to ignore the statute in favor of conflicting state law."), an employer may prove it acted in good faith to avoid the imposition of punitive damages, *see Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999) ("[I]n the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII."). As to Count III, Defendants IDOC and Wexford may therefore limit their exposure to punitive damages by proving they acted in good faith to comply with Title VII. Similarly, private parties like Defendant Sokol may invoke a good-faith affirmative defense to limit monetary damages under § 1983. *Mooney v. Illinois Educ. Ass'n*, 372 F. Supp. 3d 690, 699 (C.D. Ill.), *aff'd*, 942 F.3d 368

---

[19] For generalized background on this case, see *Rasho v. Jeffreys*, 22 F.4th 703, 706–09 (7th Cir. 2022).

(7th Cir. 2019) ("[A]t least some private actors sued under § 1983 may invoke an affirmative defense of good-faith.").[20]

That said, none of the Defendants develop this affirmative defense with *any* facts demonstrating their good faith. (*See* docs. 67 at 32; 68 at 45; 72 at 60). As bare-boned, conclusory statements do not suffice to state an affirmative defense, *Heller*, 883 F.2d at 1295, this portion of Defendant IDOC's 1st affirmative defense, Defendant Wexford's 16th affirmative defense, and Defendant Sokol's 11th affirmative defense are stricken with leave to amend consistent with the findings herein.

Similarly, Defendant IDOC does not demonstrate how *Rasho*, a class-action lawsuit by inmates alleging violations of the Eighth Amendment and the ADA, correlates to its obligations to its employees under Title VII. While Defendant IDOC's requirements under *Rasho* may be tangentially related in the sense that the Plaintiffs are employees providing the mental health services at issue in *Rasho*, neither that case nor *Howard* excuse Defendant IDOC's obligations to Plaintiffs under Title VII such that those cases may be invoked as an affirmative defense to wholly avoid liability under Title VII. *See Howard*, 989 F.3d at 602 ("[The defendants] acknowledge, as they must, that Title VII covers employees who suffer harassment

---

[20] While precedent dictates that Defendants IDOC, Wexford, and Sokol may assert good-faith affirmative defenses to Count I (the individual-capacity claim under § 1983 against Defendant Sokol) and Count III (the Title VII claim against Defendants IDOC and Wexford), it is less clear whether they may assert a good-faith affirmative defense to Count II (the official-capacity claim under § 1983 against Defendants Burle and Wexford). As the parties do not present any developed argument on this issue, it remains an open question to consider at a later point in these proceedings.

from inmates."). Again, acting in good faith to abide by other legal duties does not permit an employer to ignore Title VII, *Chaney*, 612 F.3d at 914, nor should Defendant IDOC's obligations to its inmates come at the cost of those due to its employees. In sum, Defendant IDOC's efforts to abide by *Rasho* will not excuse its liability under Title VII if Plaintiffs establish their *prima facie* case, *see Bell*, 827 F.3d at 704–05. The *Rasho* portion of this affirmative defense thus fails as a matter of law and is stricken with prejudice.

The second of the two challenged defenses is: "Plaintiffs' actions are barred, in whole or in part, under Title VII to the extent that they did not occur within 300 days of the filing of their Charges of Discrimination with the EEOC." Plaintiffs argue this defense is contrary to binding precedent because they allege a continuing violation. (Doc. 80 at 4–5). Plaintiffs' argument, however, goes to the merits of Defendant IDOC's affirmative defense, not its sufficiency. Accordingly, the Court will not strike Defendant IDOC's 3rd Affirmative Defense.

## CONCLUSION

IT IS THEREFORE ORDERED:

(1)   The Motion to Strike (doc. 63) by Defendants Wexford and Sokol is DENIED.

(2)   The Motion to Dismiss (doc. 65) by Defendant Wexford is DENIED.

(3)   The Motion to Dismiss (doc. 69) by Defendants IDOC, Rob Jeffreys, Leonta Jackson, and John Burle is GRANTED IN PART AND DENIED IN PART. Counts I and II against Defendant Jeffreys are DISMISSED

1:21-cv-01250-JBM-JEH   # 88   Page 36 of 37

WITHOUT PREJUDICE; the requested relief in Section D of Plaintiffs' prayer for relief with respect to Count I is DISMISSED WITH PREJUDICE; and Count IV is DISMISSED WITH PREJUDICE insofar as it purports to arise under the ICRA, but it is DISMISSED WITHOUT PREJUDICE insofar as Plaintiffs may pursue their claim under the IHRA.

(4)   The Motion to Strike Defendants Wexford's and Sokol's affirmative defenses (doc. 79) is GRANTED. The following of Defendant Wexford's affirmative defenses are STRICKEN WITHOUT PREJUDICE: 5, 6, 7, 9, 16, 22, and 25, and the following of Defendant Wexford's affirmative defenses are STRICKEN WITH PREJUDICE: 1, 2, 10, 11, 13, 14, 15, 16, 17, 18, 19, 24, 26, 27, 28, 30, and 32. The following of Defendant Sokol's affirmative defenses are STRICKEN WITHOUT PREJUDICE: 3, 4, 5, 7, 11, 17, and 20, and the following of Defendant Sokol's affirmative defenses are STRICKEN WITH PREJUDICE: 1, 8, 9, 11, 12, 13, 14, 19, 21, 22, 23, and 25.

(5)   The Motion to Strike Defendant IDOC's affirmative defenses (doc. 80) is GRANTED IN PART AND DENIED IN PART. Defendant IDOC's 1st affirmative defense is STRICKEN WITH PREJUDICE IN PART and WITHOUT PREJUDICE IN PART.

(6)   Plaintiffs may, consistent with the findings herein, file an amended complaint within fourteen (14) days of the date of this Order.

(7)     Defendants Wexford, Sokol, and IDOC may, consistent with the findings herein, amend their affirmative defenses in answering the amended complaint or, if Plaintiffs elect not to amend, within twenty-one (21) days of the date of this Order.

The Clerk is directed to substitute John Burle for Defendant Leonta Jackson with respect to the official-capacity claim asserted against Defendant Jackson; Defendant Jackson remains party to this suit with respect to the individual-capacity claim asserted against him.

SO ORDERED.

Entered this 25th day of May 2022.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge

37